Edward C. and Laura C. Mattes v. Commissioner.
Mattes v. Commissioner
Docket No. 102850.
United States Tax Court
1942 Tax Ct. Memo LEXIS 38; 1 T.C.M. (CCH) 220; T.C.M. (RIA) 42647; December 15, 1942
*38 1. The stock of Lambeth Realty Corporation held by Mrs. Mattes determined to have become worthless during the taxable year 1936. 2. Deduction of amount paid by petitioner Mrs. Mattes on a deficiency judgment obtained against her vendees as primarily liable and herself as secondarily liable therefor, allowed as a bad debt. 3. Deduction of a capital loss arising from the liquidation of Public Realty Company stock allowed. 4. Deduction for State taxes disallowed for lack of proof. J. Gilmer Korner, Jr., Esq., for the petitioners. J. R. Johnston, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $46,510.02 and $9,837.64 in the income taxes of the petitioners for the years 1936 and 1937, respectively. He also imposed penalties of $2,325.50 and $491.88 for the same respective years. The issues now in controversy are: (1) The deductibility in 1936 of $556,200 as a loss to the petitioner Laura C. Mattes, on account of the worthlessness of her stock of the Lambeth Realty Corporation; (2) the deductibility of $9,104.42 as a bad debt for the year 1936 arising from the payment by the petitioner Laura C. Mattes of a deficiency *39 judgment against her, due to her liability for a mortgage foreclosed because of the default of her vendees; (3) the deductibility of a loss of $4,396.32 representing 80 per cent of the loss of the petitioner Laura C. Mattes upon the liquidation of 1,935 shares of stock of the Public Realty Company in 1936; (4) the deductibility of $1,870.55, representing state taxes for the year 1937, paid in that year by the petitioners pursuant to an agreement to pay their proportionate share of taxes on certain real estate in the State of New York, purchased by them on October 27, 1936. Findings of Fact The petitioners are husband and wife residing in New York City, New York. They were married on November 1, 1933. Their joint income tax returns for the taxable years were filed with the Collector of Internal Revenue for the Third District of New York. Prior to 1933, Mrs. Mattes was the wife of Charles E. Lambeth and lived with him in Charlotte, North Carolina. In 1936 she owned 5,562 shares of stock of the Lambeth Realty Corporation, (formerly Lambeth Investment Corporation), hereinafter called "Lambeth Realty," out of an outstanding issue of 6,955 shares. Charles E. Lambeth owned 1,402 shares *40 of such stock and one share was held in the name of another. Mrs. Mattes had acquired 1,722 shares of the stock in December, 1924, for $172,200 represented by cash and real estate and corporate stocks on the basis of their cost to her. Between December 1924 and January 2, 1931, she had obtained the remaining 3,840 shares for notes and accounts representing cash advances of $284,000 made by her to the company and 5,000 shares of Cannon Mills Company stock valued at $100,000, making a total aggregate cost to petitioner of $556,200. Lambeth Realty was a North Carolina corporation which owned improved and unimproved real estate. About June 1933 the petitioner, Laura Cannon Mattes, and her then husband, Charles E. Lambeth, separated. Later in that year they were divorced. At the time of the separation, Mrs. Mattes asked her brother, Charles A. Cannon, for advice on her business affairs, particularly those in which Charles E. Lambeth was involved. Lambeth owed her a considerable amount, both personally and through his corporate interests. Cannon suggested that she appoint the Cabarrus Bank and Trust Company, hereinafter called "Cabarrus" of which he was president, to straighten out her *41 financial affairs. Cabarrus was located in Concord, North Carolina, (21 miles from Charlotte). On June 24, 1933, she made such appointment and transferred to Cabarrus in trust all of her Lambeth Realty stock. Cannon, Haywood (the trust officer of Cabarrus) and other of the Trust Company officials, employed E. T. Bost, Jr., and W. H. Beckerdite, attorneys, to assist them. Bost and Beckerdite made a thorough investigation of the financial situation of Lambeth and Lambeth Realty, and in so far as Mrs. Mattes was involved, Bost reported to Cabarrus from time to time. Haskins & Sells, certified public accountants, were employed to report on the condition of Lambeth Realty, as shown by its books. That firm made a preliminary report dated July 25, 1933, and made further reports and audits for the periods from January 1 to November 18, 1933, and from November 19, 1933 to April 27, 1934, and for the calendar years of 1934, 1935, 1936, 1937 and 1938. The preliminary report of July 25, 1933, indicated that Lambeth Realty stock had a substantial net worth. The audit for the calendar years 1933, 1934 and 1935 showed net worth of $447,587.46, $424,525.90 and $407,543.84 at the end of such respective *42 years. Values of properties were included at cost. Cannon, Bost, Beckerdite, Haywood, and other Cabarrus officials, held frequent conferences, examining carefully the information disclosed by the audits and reports and other relevant facts and circumstances. They came to the conclusion in 1933 that Lambeth Realty was not insolvent and that it had a substantial equity in its properties, if properly protected. They determined that the corporation should execute a mortgage or deed of trust for Mrs. Mattes' benefit to secure her for her past and future advances to the company. It was also decided to install a more efficient accounting system, to dispose of nonproductive property, and to reduce the overhead, including taxes and interest, as much as possible. The Lambeth Realty directorate was revised on November 14, 1933. It consisted of Haywood, Beckerdite, E. G. Bost, Lambeth and Mrs. Mattes. Lambeth remained president until April 27, 1934, when he was succeeded by E. T. Bost, Jr. The new board of directors promptly undertook to revamp the company's methods of bookkeeping and operation. On February 15, 1934, Lambeth Realty executed deeds of trust, conveyed both real and personal property *43 to Charles A. Cannon, trustee, to secure Mrs. Mattes on account of advances of $218,000 already made and anticipated future advances as required by the company. In order to follow its new policy of reducing its indebtedness and hence current interest charges, Lambeth Realty sold to Mrs. Mattes 300 shares of Cannon Mills Company stock for $110,730 and 19 shares of Public Realty Company stock for $25,155. The sale price of the Cannon Mills Company stock was its market price and of the Public Realty Company stock an agreed price based on the record and financial statement of that company. The purchase price for these stocks was credited to her account against the company, thereby reducing it to $81,492. On May 23, 1934, Lambeth Realty executed its note to her for that sum which was secured by the deed of trust. On the recommendation and advice of her brother, Charles A. Cannon and of other officers of Cabarrus, Mrs. Mattes advanced to Lambeth Realty further sums of $53,164.21, $27,264.60 and $11,762.50 in 1934, 1935 and 1936, respectively. During 1934, 1935 and 1936 the policies and program governing the conduct of Lambeth Realty affairs were continued. The trustees and management *44 made every effort to operate the company efficiently. In 1934 the management of Lambeth Realty disposed of an unprofitable investment, a one-fourth interest in the City Auditorium property in Charlotte, by transferring that interest to the city in consideration of the cancellation of all outstanding obligations and assessments charged by the city against the company. An adjustment of a debt due to the company from one George Stephens was accomplished by securing the conveyance of his half interest in certain property. In 1934, Mrs. Mattes cancelled the trust agreement with Cabarrus and thereafter E. T. Bost, Jr., president of Lambeth Realty, assumed the active management of her interests and of the company itself. In September, 1934, the par value of the capital stock of Lambeth Realty was reduced from $100 to $30 a share. On September 11, 1935, Mrs. Mattes, who was then in New York, notified her brother in writing to foreclose the mortgage. She took this action on her own initiative. In October, 1935, Cannon advertised the properties of the company for sale. In 1931 Lambeth Realty had bid in the Bryant Building in Charlotte, sold under a foreclosure proceeding brought by the Virginia *45 Trust Company. Lambeth Realty executed its notes for $47,500, some of which were unpaid in 1935. On October 28, 1935, the Virginia Trust Company filed a summons and complaint in the Superior Court of Mecklenburg County, North Carolina, and secured a temporary injunction against the sale of properties as contemplated by Cannon, trustee for his sister. Cannon, Lambeth Realty and Mrs. Mattes were named as defendants. An allegation of insolvency was made by the Virginia Trust Company, as plaintiff, in the complaint. In 1936 Lambeth Realty answered the action by alleging fraud, deceit, collusion and usury. The allegation of insolvency was denied. Upon advice of counsel they chose not to resist the restraining order at the time but to defend the suit on its merits. The answers of the defendants were filed May 8, 1936. The plaintiff demurred to the defendant's answers. The court overruled the demurrer and the defendants appealed to the Supreme Court of North Carolina, which affirmed the court below. Thereupon the plaintiff and defendants entered into an agreement settling all differences between them. The Superior Court then (in September 1939) entered a decree ordering the Bryant Building *46 sold under the plaintiff's deed of trust and determining that the price received at such sale should constitute a final settlement of all indebtedness of Lambeth Realty Company. The issue of insolvency, alleged as a condition precedent to securing the injunction, was never tried on its merits. No evidence was introduced in support or denial of the question of the insolvency of Lambeth Realty. All persons connected with that company and its operation had denied the charge of insolvency. However, in the latter part of 1936, the management of the company considered it wise to prepare its defense thereto. Therefore, it employed an expert appraiser, G. G. Galloway, to evaluate the properties owned by Lambeth Realty in order to prove by his appraisals that the company was solvent. Galloway began his work in December 1936 and continued it in January 1937. The values assigned by him to the properties were as of December 31, 1936. His report was dated February 6, 1937. The Galloway report showed that the real estate owned by Lambeth Realty had a December 31, 1936 value of $265,250. This sum was $390,310.77 less than cost. Upon its receipt, the management of the company employed Haskins & *47 Sells, who had previously examined the company accounts, to make an examination and audit for the year 1936. That firm determined that the net worth of the company at December 31, 1936 was $383,526.32, based on the cost of its properties. The net worth, after giving effect to the Galloway appraisals, showed a deficit of $6,784.45. On the same basis, their report showed a net worth of $17,233.07 at December 31, 1935. The operating deficit for the year 1936 was $24,017.52. The company suffered operating losses in 1933, 1934 and 1935. Acting on the report of Haskins & Sells and the Galloway appraisal, the petitioners filed their joint income tax returns for 1936 and 1937, claiming in each as a bad debt a deduction of $185,400 on account of their stock in Lambeth Realty. The amount claimed in these returns represents a third of the cost of the stock. In the petition petitioners claimed the full amount of $556,200 as a loss for the year 1936. The respondent disallowed the deductions, with the following explanation: * * * for the reason that evidence on file in this office indicates that the stock of Lambeth Realty Corp. did not become worthless either in 1936 or 1937. The cost of worthless *48 stock may be deducted in the year in which it is first reasonable to expect that there would never be any return to the stockholders and the asset value of the stock as to all intents, has disappeared. The records disclose that the corporation was possessed of twelve properties having a cost of $651,047.77 and that during the years 1936 and 1937 the corporation continued its interest in such properties. It was not definitely decided during 1936 or 1937 to dissolve the corporation by statutory process and until such decision is made there is no telling whether or not the corporation may pull out of its depressed financial condition through a rise in realty values. Olds and Whipple v. Commissioner, U.S. Circuit Court of Appeals for the 2nd Circuit, decided February 4, 1935. Subsequent to the appraisal made by Galloway, all of the company properties were listed with him for sale. In 1940 he succeeded in selling only two of them. The suit of the Virginia Trust Company also interfered with possible sales. Due to various reasons, a downward trend of values of several of the properties continued steadily after 1928. Based on the values set forth in the Galloway appraisal, the report *49 of Haskins & Sells showed net worth deficits of Lambeth Realty of $6,784.45, $21,727.78, and $39,698.19 as of the end of the years 1936, 1937 and 1938, respectively. Upon the entry in 1939 of the final order of the court in the Virginia Trust Company case, Charles A. Cannon, as trustee for Mrs. Mattes, advertised the properties of Lambeth Realty for sale at public auction. With the exception of the Bryant Building, involved in the Virginia Trust Company settlement, and land situated in Gaston County, North Carolina, all of the remaining ten tracts of land and improvements thereon, situated in Mecklenburg County, were sold to Mrs. Mattes, the highest bidder, for the aggregate sum of $145,937.50, pursuant to the notice of sale and the required procedure in such foreclosures. The stock of Lambeth Realty Corporation became worthless in 1936. On September 27, 1926, Mrs. Mattes and her then husband, Charles E. Lambeth, purchased the Hermitage Court property in Charlotte. At that time they borrowed $13,500 from the trustees of Davidson College and executed a deed of trust on the property to secure their note therefor. On April 11, 1927, they sold the property to Grace Graham McPhail and *50 her husband, L. D. McPhail, who assumed and agreed to pay the indebtedness to the Davidson College trustees. McPhail and his wife defaulted. In 1935 the trustees of Davidson College thereupon brought suit on the note against the McPhails, Mrs. Mattes and Charles E. Lambeth and obtained a judgment for $15,792.97 against all four defendants. The court adjudged that Grace Graham McPhail and her husband were primarily liable and that Mrs. Mattes and Lambeth were secondarily liable for the payment of the judgment. The property was sold for $8,000. The trustees attempted to collect the remainder of the judgment from McPhail and his wife but without success. On August 25, 1936, Mrs. Mattes paid the deficiency judgment and interest thereon, amounting to $9,104.42, to the clerk's office in Mecklenburg County. Thereupon she attempted to collect that amount from McPhail and his wife but found that they were execution proof. Later she attempted to force Charles E. Lambeth to contribute, but the issue, as tried by a jury, was decided against her and the court ordered the judgment against him canceled of record. In the 1936 return petitioners claimed as a loss the sum of $9,026.15. Respondent *51 disallowed. In February 1935, Mrs. Mattes purchased from Lambeth Realty 1,935 shares of stock of the Public Realty Company for $25,155, as heretofore set forth. The stock in that company was held by a number of stockholders. The price was agreed by the parties to the transaction to be a fair consideration. The company owned one principal asset, a large warehouse in Charlotte, which was occupied by one tenant. In 1936 the tenant vacated the premises, the company was unable to secure another tenant and decided to sell the building, liquidate the proceeds, and dissolve. The property was sold, the company distributed its assets to its stockholders and dissolved. In 1936 Mrs. Mattes received $19,659.60 in liquidation of her 1,935 shares of stock in the Public Realty Company. In the 1936 return petitioners claimed a deduction of 80 per cent, or $4,396.32, as a loss. Respondent disallowed the loss and determined a profit of $185.76. On October 27, 1936, the petitioners purchased real estate near Bolton Landing, New York, from a Mrs. Stengel. At the time of the sale, the seller and the purchasers agreed that the taxes for the current year, payable in January 1937, would be apportioned between *52 them. Mrs. Stengel paid the taxes in two installments. The petitioners paid to her $1,649.98 on March 7, 1937, covering the town and county taxes, and $220.57 on March 19, 1937, covering school taxes, as their share of the taxes. In the 1937 return petitioners claimed a deduction for taxes paid of $1,870.55, which respondent disallowed. Opinion VAN FOSSAN, J.: The first issue presents the question when Mrs. Mattes' stock in the Lambeth Realty Corporation became worthless. She contends that the worthlessness occurred in 1936, as determined by the Galloway appraisal and the consequent deficit in the net worth of the company at December 31, 1936. The respondent has assumed a dual attitude toward this issue. In his deficiency notice he clearly stated that the ground of his disallowance of the deduction was that the asset value of the stock had not yet disappeared in 1936. During the taking of testimony by deposition and at the hearing, he maintained that the worthlessness was fixed either before or after the year 1936. In his reply brief he took the position that the stock was actually worthless prior to 1936. By an elaborate process of evaluating singly the various pieces of property *53 owned by Lambeth Realty and by means of a comparative analysis based in part on the Galloway evidence and in part on the various vicissitudes suffered by the company in its transactions prior to 1936, he concludes that at some indefinite time, several years theretofore, the company was insolvent. In this case we have a long, complex, and somewhat confused record consisting largely of testimony taken on deposition. The problem is clarified and becomes comparatively simple, however, by keeping in mind the fundamental fact that the principal issue to be determined is when Lambeth Realty actually became insolvent. There is no question in our minds as to the fact that the stock became worthless at some time. The difficulty lies in the determination of the year in which it occurred. The story is one of gradual deterioration with few outstanding events. In 1933 the financial condition of the company was first questioned by Mrs. Mattes. She was a woman of considerable wealth and had contributed large amounts to the company in cash and valuable property in exchange for its stock. The corporation was a family affair but domestic differences developed between Mrs. Mattes and her then husband, *54 Charles E. Lambeth. They separated and soon were divorced. Thereupon she sought the advice and counsel of her brother, Charles A. Cannon, an outstanding business man and industrialist. Cannon suggested that she intrust to the Cabarrus Bank and Trust Company the task of disentangling her financial affairs. She followed his advice and transferred her Lambeth Realty stock in trust to Cabarrus. Immediately Cannon and other officers of Cabarrus employed a firm of attorneys, Bost and Beckerdite, to make a complete investigation of Lambeth Realty and of Charles E. Lambeth personally. They then employed Haskins & Sells, certified public accountants, to make a report of the company's condition as shown by its books. The report showed a substantial net worth but since cost rather than value of properties was used, it did not represent true net worth. Cannon and his fellow managers of Mrs. Mattes' affairs were thoroughly conversant with the properties owned by the company. They were capable business men. After careful consideration of all the facts developed by their extensive examinations and investigations, they concluded that the company was not insolvent but that its business policies and *55 accounting methods should be changed. A new directorate was chosen. It proceeded promptly to put the proposed changes into effect. The company's business was continued by Cannon, Bost and their associates during 1934, 1935 and 1936. They made such moves as they deemed advantageous to its anticipated success. They attempted to secure Mrs. Mattes for her present and future advances. On advice of her brother and his associates, she continued to contribute substantial sums necessary to pay taxes and other obligations of the company during 1934, 1935 and 1936. In September 1935, Mrs. Mattes notified her brother to foreclose the mortgage given by the company to secure her loans to it. The record does not disclose her motive for that action. Pursuant to the notice, Cannon advertised the property for sale. The Virginia Trust Company immediately obtained an injunction to prevent the sale, alleging the insolvency of Lambeth Realty. That issue was never tried on its merits, although all of the Lambeth Realty officials denied the insolvency charge. On advice of counsel other issues were set up in defense and the case proceeded along those lines. In the latter part of 1936 the company officials, *56 deeming it wise to prepare its defense to the charge of insolvency, employed an expert appraiser, expecting to support its solvency. Galloway, the appraiser, proceeded to make a comprehensive examination, appraisal and report covering the values of the several properties of the company as of December 31, 1936, which showed that values were much less than the cost of properties as carried on the books. Haskins & Sells then made an examination and audit for the year 1936. Their report showed a net worth deficit of $6,784.45. From this resume of the facts, it seems clear that when Cannon and his associates and their attorneys made their investigation of Lambeth Realty's condition in 1933, the company was considered to be, and was, solvent. Those men believed that, with proper management and altered policies, the value of Mrs. Mattes' stock could be recovered in part, if not in its entirety. However, the company's assets gradually declined in value during the ensuing years. They did not reach the amount of its liabilities until December 31, 1936, as determined by Galloway. As the Board said in : Generally there is *57 some event which evidences the destruction of value, ; but in any event actual worthlessness should be the test and the burden of proof is on the taxpayer to show that the loss which he claims was sustained in the taxable year in which he seeks to claim the deduction. ; affd., ; certiorari denied, ; . So here, actual worthlessness is the test and we believe that test has been met by the petitioners. During the latter part of 1936 Cannon, Bost and other officials of Cabarrus, believed that Lambeth Realty was solvent but, realizing that they soon might have to meet the insolvency issue, they employed Galloway to make a thorough examination and appraisal of the company's assets in order to fortify their position. It is apparent that his work could not have been accomplished in one day, nor could it all have been completed before December 31, 1936, the date fixed as the *58 time of valuation. The physical completion of Galloway's report in 1937 does not, however, alter the fact that the aggregate values of the properties owned by Lambeth Realty on December 31, 1936, were over $390,000 less than their cost, the basis on which previous audits and reports had been made. By applying to the 1935 audit, the figures furnished by Galloway, Haskins & Sells found that the company had a net worth of over $17,000. In view of the nature of the assets and the constantly declining trend of values, it is obvious that the net worth on December 31, 1935 was considerably more than that sum. Hence, at the beginning of 1936 the petitioner's stock had a material value but at the end of that year it had none. In , affirmed , the Board treated exhaustively the subject of worthlessness of stock. In that case the Board said: The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must *59 be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and cannot be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. Here, if a single event must be designated, the "identifiable event" was the Galloway report which extinguished the petitioner's hope and expectation that she would recover any of her investment in Lambeth Realty stock. This report was of conditions as of December 31, 1936, and reflected the 1936 situation. The fact that it was not completed until February 1937 does not affect its basic date. It demonstrated that in 1936 petitioner's stock had become worthless. The important fact is that the company's assets were less than its liabilities, as demonstrated in the Galloway appraisal, *60 and not the circumstance that Mrs. Mattes did not discover the fact until some time in 1937. After 1936 there was no reasonable basis for hope of improvement in the financial position of the insolvent company. On the facts of record we conclude that Mrs. Mattes' stock in Lambeth Realty became worthless in 1936. She is entitled to the deduction of $556,200 claimed. The second issue involves the deduction of an amount paid by Mrs. Mattes on August 25, 1936, in satisfaction of a deficiency judgment obtained by the trustees of Davidson College against L. D. McPhail, Grace Graham McPhail, his wife, Mrs. Mattes, and Charles E. Lambeth. The debt was primarily that of the McPhails and was so determined by the court. The McPhails had assumed and promised to pay the debt due the Davidson College when they purchased the Hermitage Court property from Mrs. Mattes. Upon the sale of the property to the McPhails, the assumption of the Davidson College loan by them, and their promise to pay it, constituted an obligation from them to Mrs. Mattes. Their failure to pay that obligation and the consequent judgment (which Mrs. Mattes was forced to pay) created a debt to her of the amount so paid. The *61 McPhails were found to be execution-proof and hence she was unable to force them to pay the debt. It thereupon became a bad debt and is deductible as such. The record shows the amount actually paid was $9,104.42. The attempt of Mrs. Mattes to compel Lambeth to contribute has no bearing on the loss sustained by her in 1936 by reason of the bad debt. Upon the subsequent trial of the issue, Lambeth was absolved from liability. Thus Mrs. Mattes alone was liable for the payment of the deficiency judgment and she so paid it. The third issue relates to the deduction of a capital loss sustained by Mrs. Mattes on the liquidation of her Public Realty Company stock. The facts show that she purchased the stock in February 1935 for $25,155. The amount paid to her upon the liquidation of the company was $19,659.60. The loss, $5,495.40 is obviously allowable to the extent provided by the statute. The fourth issue involves the deduction of New York state taxes paid by the petitioners pursuant to their agreement with the vendor at the time of the sale of the Bolton Landing real estate to them. The petitioners purchased the property at a stated price. They and the seller agreed to pay each his own *62 taxes for the respective periods of the taxable year during which the property was owned by them. In , the Supreme Court held that tax liens had attached against the properties, that the vendors had become personally liable for the taxes prior to the purchase by the vendees and that, hence, the vendees could not deduct their proportionate shares of such tax paid by them pursuant to the sale agreement. See . In the case at bar our attention has not been called to any provision of the New York statute specifically creating a lien for real estate taxes. The petitioners have stated that the taxes were assessed, accrued, became due and became liens on January 1, 1937, but they cite no supporting authority. However we do find that the general tax laws of New York (McKinney's Consolidated Laws of New York, annotated, Book 59, Section 9) provide that real property shall be assessed as of July first in the tax district in which it is situated. The statute further provides: "In all cases the assessment shall be deemed as against the real property *63 itself, and the property itself shall be holden and liable to sale for any tax levied upon it." Section 50, at the same Book 59, requires the Board of Supervisors of the County to examine the assessment rolls for the purpose of equalizing assessment against the several tax districts thereof. Between September 1 and the annual meeting of the Board of Supervisors, the equalization commissioners examine the valuations and may alter the aggregate valuations, as provided by statute (Sec. 52). They file their report on or before the tenth day of the annual meeting of the Board of Supervisors. The Board of Supervisors may correct errors (Section 56). At the annual meeting the Board of Supervisors levies the taxes and sets down on the assessment rolls the amount of tax against each parcel of real estate, based on the levy (Sec. 58). On or before December 1 of each year, but not later than February 1 of the following year, the Board of Supervisors shall annex to the tax roll a warrant commanding the collector of taxes to collect the taxes so appearing from the persons named thereon. In , *64 the Court held: Where any particular unit of government in this state has jurisdiction to impose a tax on real property, the assessment rolls must be prepared and completed and the amount of the tax ascertained and determined as and in the manner prescribed by law and the assessment roll confirmed by the agency charged with the duty of confirming the roll before the assessment or tax can become a charge against or a lien or incumbrance upon the land to which it relates in all cases where the applicable statute is silent as to the time when the lien attaches. * * * The amount which the taxpayer must pay is then fixed and becomes due. The sale of the Bolton Landing property was made on October 27, 1936. Thus we can not determine from the present state of the record precisely when the tax liens attached and hence can not allow the deduction claimed. See , affirmed . Decision will be entered under Rule 50.